Good morning, Your Honor. My name is Donald Shepard. I'm representing Llewellyn Pantovic. In the matter, he had an asylum application that was denied before the immigration judge and then the Board of Immigration Appeals issued an affirmance without opinion. Mr. Pantovic is claiming that the immigration judge and the Board of Immigration Appeals in issuing the affirmance without opinion decision denied his due process because the immigration judge failed to give specific cogent reasons in finding that his testimony was incredible. Additionally, Mr. Pantovic was denied due process because of the use of an ineffective translator, which I'll go into more details on. The use of the ineffective translator prejudiced the outcome of this case. The petitioner argues that the Board of Immigration Appeals and immigration judge erred in making the adverse credibility determination in his case. The Board of Immigration Appeals, in affirming the immigration decision, determined that Mr. Pantovic's case was not credible because his testimony was not consistent with other evidence in the record. This circuit has made it clear that adverse credibility findings cannot be based on speculation, conjecture, or unsupported assumptions. Adverse credibility must be supported by specific cogent reasons. After stating that Mr. Pantovic's testimony was not credible, the immigration judge remarks that the petitioner made no major material inconsistent statements and goes on to say that Mr. Pantovic's rendition of past persecution and fear of future persecution does not ring true. The immigration judge then failed to give any specific cogent reasons for his finding of the adverse credibility. The immigration judge does state the petitioner failed to provide a reason for having left the military. Mr. Pantovic did express why he left the military. He left the military in December of 1993. At that time, he was secretly involved with the Serbian renewal movement and was meeting secretly, but he also objected to the political views of Serbia at the time. The immigration judge also states that the petitioner provided no explanation as to why he waited so long to apply for asylum and that his actions in waiting led him to question his credibility. Mr. Pantovic did provide an explanation as to why he waited. The reason he waited to apply for asylum was because he initially came to the United States as a visitor and was here visiting and received a summons in 1998 asking him to return for war. At that point is when he established fear to return back to Serbia. What are we what's the effect of changed conditions? His fear of going back at that time is based on having to be sent off to the front lines and be killed. Now, there's clearly been a regime change and there's a whole difference. How does that affect the posture of any relief that you could get here? There's also an order against him right now for not appearing to go back to war, and he's been sentenced to three years. His concern is that that will actually be longer and that he will be persecuted based on that. Was that under the Milosevic regime that that order was issued? Yes, under the special police of the regime at the time. And that order is still effective if he goes back? As far as he knows, yes. The order was ordered after he was requested two times to come in after he did not. I understand how it was issued or why. This is one of the cases where delay in the process or the normal delay. I mean, there's been quite a change since. And a lot of his concern obviously was directed at the Milosevic regime. There's been no rescission of that order. Well, has he sought it? Has he what? Has he sought rescission of the order? No. Okay. All right. In the Respondent's brief, they argued that the petitioner's story was implausible. Respondent argued that the petitioner was honorably discharged from the military and that that was inconsistent with him being considered a traitor. I want to note to the Court that when he was honorably discharged, it was in 1993. Prior to the interrogations in 1996 and the summons, it later came in 1998. Mr. Pintovich also claims that the use of ineffective translator resulted in the denial of due process. It's been established that a full and fair hearing involves competent translation. Incorrect or incomplete translation is like having no translation at all. This circuit has found that three types of evidence tend to prove incompetent translation, which is direct evidence of incorrectly translated word, unresponsive answers by a witness, and witness expression of difficulty understanding what is said to him. These are all from Perez Lester. In Mr. Pintovich's case, the record reflect all three types of evidence indicating he received ineffective translation. Petitioner can only point to the record and reflect problems with the translation. A direct error of the interpreter was found in the record whenever the petitioner explained that his wife worked in a hospital in the gynecology department and the interpreter stated that she worked in the engineering department. The interpreter did correct herself, but it goes to reason that she incorrectly translated that. Who knows what else was incorrect. Well, what do you mean who knows? I mean, what was the correct translation? The petitioner stated that his wife worked in the gynecology department. No, I understand, but you say who knows what else because it was one mistake, therefore, the whole thing is. Not the whole thing, but it's hard to tell from the record without. What is it in the I.J.'s opinion that shows that he misunderstood in some material way that translated into an adverse decision? The issue that he found the testimony to be incredible, I think, prejudiced the petitioner in the fact that the immigration judge found that his complete testimony was not. What is it that he found, as a matter of fact, that Petitioner argues is wrong based on what he thought he said in the hearing? Give me the one, the gynecology engineering, but what is there that's in the record to show that. There's numerous instances where the immigration judge is getting aggravated with the petitioner and instructs him to answer questions directly. And that happened throughout the transcript on numerous occasions. Now, this does reflect that there was a problem in the translation, but it's hard to tell from the English transcript exactly what happened. Well, does that statement meet your burden of showing prejudice? In other words, it's one thing to have a translation problem, but it's quite something else to show that the Petitioner was prejudiced by that problem. We've said many times that showing some problems isn't enough. But I think in this situation, finding adverse credibility or not believing the Petitioner's story does prejudice him. The fact that if there was difficulties with the translator, if the translator was having problems and he was having difficulty in getting his story across, the immigration judge came out and said that it doesn't sound true to him. So that would be prejudice to him. The Respondent asserts that the Petitioner continued to interrupt the interpreter, testified too quickly, and refused to provide direct answers. This is all evidence, I argue, that the translation was incorrect or the translator was ineffective. If the Petitioner is interrupting or having problems with the interpreter, if the Petitioner is having problems trying to answer questions and it shows that potentially that the hearing is not proper, that the translator is not reporting everything correctly as told to her. In one situation, the immigration judge instructed the Petitioner. If we do, because you're running out of time, if we do agree that the, and I'm just at this point hypothesizing, but if we were to agree that the immigration judge did seem to misunderstand the issue of the draft, you know, the recall notice and all of that, and what would be the remedy you're asking for? What should we do? I would ask that this Court accept the testimony as accurate and grant him asylum. I do understand that it may be necessary to remand. But if his testimony is considered to be accurate, then I think there's enough evidence to show that he does fear prosecution and he does not. But it's a fear. You're not arguing that it was so pervasive against him that, like the case we just heard, Mr. Zais, that it should be humanitarian ground. You're saying that he fears future prosecution. Correct. Right. And that comes back to my original question. You know, there's been a dramatic country change. So is that something we should just ignore? It shouldn't be ignored, but it doesn't take away the fact that the order is still against him and he does have the future fear. But you say he hasn't taken any steps to try to test whether that order is going to be enforced? I'm not aware of any steps that he's taken with that. Okay. All right. You used up your time. I thank you. Thank you again, Your Honors. May it please the Court. I'll begin again. Do I have to state your name? This is all recorded. John Cunningham. We know who you are. Forgive me. John Cunningham from the Justice Department, appearing on behalf of the Attorney General. May it please the Court. I guess I should begin again with the translation issue, because that is a threshold issue always. If the question is, was the hearing so flawed that the Petitioner was denied a reasonable chance to make his case, and therefore a new hearing should be ordered, you should not do what my colleague suggested, which is say, well, the translation was flawed, therefore we will credit the testimony as we see it on the printed page and find this person eligible for asylum. Well, the one place where I don't know whether it's translation or what, but it is clear that there is a disconnect, at least as I read the record, between what the argument is as to why he sought asylum. Yes. Because the I.J. saying, I don't understand why you waited so long. Yes. And there's a declaration and whatever. It says, look, I got this draft notice, and I don't want to be sent to Bosnia. I don't want to be killed on the front lines, and I don't want to go to prison for the rest of my life. Yes. And it's not addressed. It's – this case is odd, because it does seem to fall into different segments. The petitioner first claimed that while he was in the military for 30 years, he was considered to be a traitor, and the immigration judge didn't accept that testimony because the petitioner was – rose to the rank of captain, received an honorable discharge, and received a military pension of 50 percent of his pay. Several years went by, and then the petitioner, he said, participated in demonstrations against the Milosevic government in November of 1996, and he said that as a result of that, he was interrogated harshly, that a bright light was shown in his face, that the secret police came to his house many, many times, and he then left for the United States. And the immigration judge had trouble crediting that for two reasons. First, the petitioner left his wife and daughter behind, and they were subjected to the same treatment, and also because he said that when he first came to the U.S. in May of 1997, he intended to go back. He entered as a tourist, and he said, oh, I intended to go back. And the immigration judge said, well, now wait a minute. You said that you were fleeing this brutal treatment, these brutal interrogations, and these repeated visits to the secret police. Why did you want to come back, and why are you – why did you wait so long after you came here to apply for asylum? He entered in May of 1997. He didn't apply for asylum until August of 1998. Then the new story, the third story emerged, which was, well, I received a notice from the Yugoslavian government to report back to military service. So there are sort of three different things here. And in his brief, he says that that's when my fear of persecution really arose. It seems as if he is essentially abandoning everything he said happened to him before he left Yugoslavia. This is on pages 15 and then again 22 of his brief. In explaining why he waited so long to apply to asylum after he came to the U.S., he says, and this is in the paragraph on page 15 beginning the IJ further states, the third sentence says, The Respondent consistently testified that his fear of returning to Serbia was not realized until he was summoned back to military service in 1998. And then on page 22 in the paragraph beginning, Mr. Pantevic feared returning to Serbia. In the fourth sentence, I think it is, he says, He was repeatedly approached by government officials before his departure to the United States. Well, that's quite a bit different from talking about brutal interrogations and visits to your home by the secret police. He now says, I was approached by government officials. And then he goes on to say, But did not truly fear future persecution until he was called back to the military. And so it seems in his brief that he is junking all his testimony and evidence about what happened to him supposedly before he left Yugoslavia. And he is now pinning his case almost entirely. Well, I don't quite understand it that way. I thought he was saying, look, I went through this process, but I've now got a taint on me because of my prior activities. And if I go back, and I'm summoned in, this is how I'm going to be persecuted. Well, it's an entirely, well, it's an entirely. He's junking the whole thing. I think that's an overstatement. Well, he, it seems, Your Honor, that he is, he said that, he doesn't claim, though, he doesn't claim that he was called back to military service because he was branded as an anti-Milosevic demonstrator. He simply says, I received this summons. And it gets a bit complicated because, of course, the law is clear that simply having a national service law or a military service law by a country and enforcing that law is not persecution, nor, and receiving punishment for evading that law or resisting it is also not persecution. The question becomes, is the persecution, is the punishment disproportionate? And then there's the other doctrine of cases, which holds that if you know you are going to be sent to a front and made to perform genocidal or anti or ethnic cleansing killings and you refuse to do that, that is a persecution within the meaning of the asylum statute. The difficulty is we don't have any evidence of that in this case. All we have is the summons, and it seems to be a regular government doctrine or document, excuse me, from the government saying, please report back. We want you back in the military. And then he received a notice that since he didn't report back, as he was supposed to, he has been in effect convicted in absentia and faces a prison term. Well, just I want to make sure I'm looking at evidence that the IJ had. There's his declaration of, let me get the date. It's like November 29th, 1999. Yes, Your Honor. That was part of the record? Yes. Yes. Well. That he received the summons and that he. Well, it's more than that. I mean, he's talking, he was laying out sort of a sequence of events and then says, you know, once I got out of the army, I was becoming, you know, I became identified. Once I got out of the army, I was identified as someone who was anti Milosevic. Yes. And now I've got the summons. And if I, I've got these two friends of mine who were sent to the Bosnian front and killed. Yes. So you're saying that, you know, these are, you're segmenting these as if they have no relationship. I think, well, I think the immigration judge. Where does the IJ deal with that? I think, Your Honor, the immigration judge's, the immigration judge's decision does not pay much attention to the summons because he didn't believe everything that went before it. How do we know that? We can't get in our heads. Well, he said. You don't have to be frivolous. No, I understand that. He said that, well, on page 53 of the record, the middle paragraph, he says that due to the fact that I find the Respondent's testimony and evidence is not credible, I find that he has not met his burden of proving that he suffered either past persecution or a fear of future persecution should he return to Yugoslavia. The immigration judge basically said that we, he credited the fact, I think. That doesn't meet the IJ's obligation to tell us what he's thinking. I mean, that goes, that's boilerplate. How do, I have no way of looking at this and understanding why the IJ discredited the fear of going back to the Bosnian front. I mean, is there something, maybe I missed something. I don't think the immigration judge directly addressed, Your Honor, the fear of specifically going back to the Bosnian front. He did not believe that this person had been branded as an anti-Milosevic traitor. He believed that the person had received a summons since he came to the U.S. He believed that the person had received a notice of a conviction since he came to the U.S. But he did not believe that the issuance of the summons to report back to military service or the issuance of the judgment of conviction was on account of this person, Mr. Pantevic, being a anti-Milosevic activist. Because he didn't believe the story that Mr. Pantevic had told about his testimony, about his life in Yugoslavia before he left. And when asked why, I think that goes to the question why he waited so long to apply for asylum. The immigration judge was troubled by that because the story that Mr. Pantevic told portrayed someone who was under the gun, was being harassed by the secret police. That's why I left, he asked the immigration judge to find. And the immigration judge said, well, why then, why did you wait a year and a half before applying for asylum? Well, he gave an answer to that. I waited a year and a half because the thing that triggered it was the summons. Let me just ask the question, because you're about out of time. Yes, Your Honor. If we were not to agree with you, and what would be the remedy, as I asked Petitioner's counsel, what should we do? Oh, that's clear, Your Honor. The remedy should be a remand back to the immigration judge. Because essentially, what you'd be concluding is that the adverse credibility finding was not based on substantial evidence. And so you would have to remand back to the immigration judge and say on the – and for further proceedings consistent with the Court's opinion, whatever flaws you might find in the adverse credibility finding. And then what would that mean insofar as changed conditions? In other words, would – as I indicated to Petitioner's counsel, I mean, take notice, I think, that there's a new regime in place.  Yes. So how does that get in before the IJ? We would ask for clarity from the Court on that point, Your Honor, because the Court's decisions in this area are not clear to our office or to the Board. On occasion, the Court has remanded back to the finder of fact and barred the introduction of – Well, sometimes we've also invited the BIA to look at it. Yes, you have. In the Hawthorne case. You have. Yes, you have. And there is – there is some tension in the Court's decisions on that point. My time is up. If the Court has any further questions, I thank the Court for its attention. Thank you. All right. Both sides used up your time, so this case is submitted for decision. Thank you for your argument. Next case on the argument calendar is Coffield v. Smith. Good morning, Your Honors. May it please the Court, Cara DeVito for Appellant Mark Coffield. Has your opponent managed to get seated yet?
judges: Tg Nelson, Tashima, Fisher